*6
 
 WALKER, J.
 

 This action was for the purpose of partitioning certain real estate in the city of St. Louis, and to secure an accounting for the rents and profits arising therefrom. There was a trial before the court, resulting in favor of the plaintiff, from which the defendant appeals.
 

 In the fall of 1906 P. F. Vander Lippe was in the real estate and loan business in the city of St. Louis. John Davies was an architect and a builder. E. H, Keiser, the defendant herein, had for many years prior
 
 *7
 
 and subsequent to 1906 been building houses, selling them and investing in real estate mortgag.es, stocks and other securities. Vander Lippe had for sale at $2500 two lots adjacent to each other, aggregating one hundred feet, on Cottage Avenue, city of St. Louis, belonging to a man named Smith. Vander Lippe offered the lot to Davies for that price, $1500 of same to be paid in cash, and Vander Lippe agreed to make two building loans of $7500, secured by deeds of trust on the property, with the proceeds of which two flats were to be erected thereon. A second deed of trust for $1000 was to be given by Davies for the balance of the purchase price, with a power of attorney to Vander Lippe to collect the rents on the flats to be erected, and apply the same to the payment of the second deed of trust. When Vander .Lippe made this proposition, Davies consulted with Keiser and explained to him how the lots could be bought and paid for and the buildings erected thereon as indicated. Keiser agreed with Davies that he would furnish the required $1500 in cash. Before the agreement was consummated, Vander Lippe had conferred with a Mr. Wright, and the latter agreed that he would purchase the two first deeds of trust, or the building loans of $7500 each, from the proceeds of which the two flats were to be erected. After the talk between Davies and Keiser, the latter paid the $1500 in cash, and the two lots were deeded by Smith to a straw man named Cooch. Cooch executed the two ¿feeds of trust for $7500 each, one covering each lot, and gave a second deed of trust for $1000 covering both the lots, and executed a power of attorney to Vander Lippe to collect the rents from the flats when, erected, to pay off the second deed of trust. The two $7500 deeds of trust were turned over to Vander Lippe to be transferred by him to Wright, and Cooch made a quitclaim deed to the lots to the defendant Keiser. At the time these papers were signed, Davies and Keiser entered into a formal written contract setting forth the above facts and their interest in the property. This is
 
 *8
 
 the agreement which is the foundation of this suit, as set forth in the pleadings.
 

 It was understood that Vander Lippe was to get a commission of two and one-half per cent, or $375 for the sale of the two deeds of trust, to be taken out of the $15,000 realized from the sale of the notes secured by the deeds. After these papers were executed and the deeds of trust were in the hands of Vander Lippe for sale to Wright, Keiser stated to Davies that he would take the deeds of trust and by using them as collateral at the Jefferson Bank secure the loan of $15,000 with which to build the flats and by this course avoid the payment of the $375 to Vander Lippe for securing the loan. Davies assented to this course. Keiser obtained from Vander Lippe the two deeds of trust, and thereafter retained them, but told Davies that he had put them up at the Jefferson Bank as collateral to raise the $15,000.’ Several years afterwards Keiser had them released on the record.
 

 It was contemplated that the flats to be erected by Davies were not to cost more than $15,000. He was not to make any profit in their building, but was to contribute his services as an architect and builder to equalize the $1500 Keiser had advanced, the agreement, as before stated, being that Keiser should furnish $1500 in cash, and Davies $1500 in services in the drawing of the plans, and the supervising, superintending and building of the flats. Davies testified that had the builder’s profit been included, the flats would have cost $16,500 to $17,000; that when Keiser advanced the money from time to time he (Davies) actually built the flats for $15,000, but after they were completed, as is usual, there were some extras mutually agreed to by Keiser and him, which increased the total cost. These extras were gas fixtures, granitoid walks, sheds in the rear and other necessary things. These extras cost several hundred dollars, and the money to pay for them was advanced by Keiser in accordance with an agreement between the parties. The erection of the flats was started in December, 1906, and
 
 *9
 
 they were completed in March or April of the following year. There is no dispute that Davies drew the plans for the flats and superintended their erection; or that he ever received anything for his services from any source.
 

 On the second day of the trial, after plaintiff’s testimony had been taken, the defendant filed an amended answer stating that the contract, after it had been formally executed, was abandoned by an oral agreement between Davies and Kaiser. In support of this abandonment as pleaded, Keiser testified that Vander Lippe was unable to sell the two $7,500 deeds of trust and that he asked Davies if he, Davies, would erect the buildings for $15,000, and Davies said he would, and that he, Keiser, then advanced the $15,000, and the buildings were erected by Davies in accordance with this oral agreement. Vander Lippe denied that he was unable to sell the two deeds of trust and stated that he had them sold to Wright, and that the $15,000 would have been forthcoming when Davies or Keiser wanted it. D'avies testified that Vander Lippe had perfected arrangements for the sale of the notes secured by the deeds of trust, and that there never was any question but that this sale could have been consummated by Vander Lippe. He denied that the deeds of trust could not have been sold, or that he entered into an oral agreement with Keiser by which the written contract was abandoned, as testified to by the latter.
 

 The flats, when completed in March or April, 1907, were in accordance with the written agreement placed in Vander Lippe’s hands to collect the rents, and the rents were collected by him under power of attorney and were applied to carry the property and to make payments on the second deed of trust.
 

 About 1910 or 1911, Vander Lippe became pecuniarily embarrassed, and by mutual agreement between Davies and Keiser the latter undertook to handle the property and place the collection of the rents with the Comet & Ziebig Real Estate Company in St. Louis. Keiser, how
 
 *10
 
 ever, has been handling the property ever since, is handling it now, and has enjoyed all the rents and the profits therefrom. Yander Lippe testified that while he was collecting the rents' he made several statements of collections to Davies, and always made them to Keiser; that he knew that Davies had an interest in the property, because of the written contract he had prepared.
 

 Davies testified that about 1912 he asked Keiser for an accounting, but that Keiser told him “the property don’t pay and there is nothing coming. ’ ’ Thereafter, on the last day of the year 1912, Davies recorded the contract sued on. Thereafter, he testified that he made two or three demands upon Keiser for an accounting. About every two years he would ask him for an accounting, but Keiser would always make the same reply, “The property don’t pay and there is nothing coming.” According to Davies’s testimony, Keiser never contended that he was the sole owner of the property, nor did he contend that Davies had no interest therein, but conceded the interest and at the same time claimed that the property was not paying the carrying charges. Davies further testified that several months before this suit was instituted, in a conversation about the property, Keiser informed him that he was going to make him a present of $500 some day. Thereupon, Davies said he did not want the $500; but “what I want is the square thing.” That some time before this, while he was settling another suit with Keiser, the latter wanted him (Davies) to execute a quitclaim deed to the property, but that he refused to do so, saying that this property was another matter entirely. Keiser did not deny these statements; either that he was going to give Davies $500, or that he wanted a quitclaim deed.
 

 Keiser admitted upon the witness stand that, when the attorney for the plaintiff wrote him before this suit was instituted formally asking for an accounting, he did not deny that an accounting was due, but simply made no reply.
 

 
 *11
 
 It is further shown that after these flats were erected Keiser and Davies did business with each other for several years, and during that time put up more than twenty houses. Davies testified that he trusted Keiser to do the right thing and to treat him fairly, inasmuch as Keiser was his trustee, and he trusted him to render an accounting when there was a balance due under the contract. During this time Davies became financially involved and was unable to carry on any litigation. He was indebted to his daughter for services rendered, and on September 8, 1920, he assigned to her his interest in the contract and the right to an accounting against the defendant, and at the same time executed to her a quitclaim deed to the property involved.
 

 I. There was evidence
 
 pro
 
 and
 
 con
 
 as to the execution of the oral agreement between.Keiser and Davies, which defendant contends modified or abrogated the prior written contract. The defendant testified that such an agreement was made. Davies testilled to the contrary, and his testimony was corroborated by Vander Lippe. The proceeding being in equity, we are required to weigh the testimony. In addition to the corroboration of the testimony of Davies by Vander Lippe, other facts and circumstances in evidence have a like tendency. In addition,' the time and manner in which the oral agreement was set up as a defense may be considered in passing upon the credibility of defendant’s testimony and in measuring its probative force as compared with that submitted by plaintiff. In short, it is permissible in weighing the testimony, not to question the propriety of defendant’s right to thus plead, or the admission of the testimony, but to take into consideration the fact that the defendant, at all times familiar, as he must have been, with every phase of this transaction and knowing, as he -must have known, that plaintiff’s suit was based upon the written contract, did not discover until after the trial was on and plaintiff had
 
 *12
 
 introduced all of Ms testimony that the very
 
 res integra
 
 of the matter had been abrogated by a transaction, which, until then, had not been intimated, much less pleaded as a defense. It. would probably suffice to say that such is the quantum of plaintiff’s proof that we feel inclined, as we are authorized under repeated precedents (Williamson v. Frazee, 242 S. W. (Mo.) l. c. 962; McKinney v. Hawkins, 215 S. W. (Mo.) l. c. 253; Daudt v. Steiert, 205 S. W. (Mo.) l. c. 225 and cases) to defer to the finding of the chancellor who heard the cause and to hold that the weight of the testimony is with the plaintiff.
 

 In weighing the testimony, however, we are not limited to its quantity, but we may properly take into consideration all the attendant relevant facts accompanying its admission to assist in determining its quality or cogency to establish the fact to which it relates. Hence, the propriety of a reference to the tardy manner in which defendant offered Ms testimony in regard to the oral agreement. Among other tests to determine if his testimony “turns upon the poles of truth” we may compare it generally with that of other witnesses testifying under like circumstances concerning similar subjects. One against whom an action is brought depending for its support on a single fact — in this case the existence of the written contract — does not ordinarily or otherwise content himself with a naked denial, but if there exists a complete defense, concrete in its ap-' plication, and, if true, convincing in its nature, it is promptly interposed. Lying in wait with a defense of this character until the trial is on and the plaintiff has introduced his evidence, does not, to say the least, lend a color of credibility to the testimony of the defendant. Considered from whatever vantage, therefore, we conclude that the findings of the chancellor in this regard were correct and that there was no sufficient proof to establish the oral agreement.
 

 
 *13
 
 
 *12
 
 II. That a trust was created in Keiser by the written contract is evident from its terms as informally set
 
 *13
 
 forth in the statements of facts. The nature of that trust is one of the matters in controversy. After providing the manner in which the parties were to contribute to the enterprise, the one by furnishing the money with which to purchase the lots and the other by lending his skill as an architect and his experience and services as a builder in the erection of the flats, and the manner in which the money was to be procured to defray the cost of construction; the contract
 
 in haec verba
 
 provides: “It is hereby agreed between the said parties that out of the sale of said property subject to all of the incumbrances hereinbefore mentioned, said Keiser shall first be reimbursed for the cash advanced by him with interest thereon from April 1, 1907, at the rate of six per cent per annum, and the net balance remaining shall be divided in equal parts between the said parties hereto. If the property should not be sold, after it is all completed, the income derived therefrom after above $2500 is fully paid is to be divided in equal parts between the parties hereto, or if the parties desire to effect a settlement of their interests at that time it may be done by each of said parties taking one of the said sets of flats.”
 

 The magic of set phrases or the use of particular words is not necessary to the creation of a trust. Whether one exists or not is to be determined from the purpose of the parties as indicated by the language employed. If it appears from the whole instrument that it was the intention of the parties that the property was to be dealt with by the party holding the legal title for the benefit in part of another, equity will affix to the transaction the character of a trust and impose upon the party holding the legal title such duties as are necessary to the performance of same.
 

 The property in question was in fact purchased by both of these parties. Keiser furnished the money to pay for the lots. The amount required for the construction of the buildings was procured by securing a loan for the payment of which the lots were pledged. Davies’s interest in the property arose out of the contribution
 
 *14
 
 of his skill and services in superintending the erection of the buildings.
 

 The object of this transaction is clearly defined by the portion of the contract quoted. It was to effect a sale of the property and after reimbursing Keiser for the cash advanced by him with interest, the net balance was to be divided between him and Davies. If not sold, the income therefrom after the amount due Keiser had been paid was to be equally divided between the parties; or, if they desired to effect a settlement of their respective interests, each was to take one of the flats. Under the terms of this contract, it is evident that the parties had a joint interest in the property. Keiser held the legal title and while the interest of Davies was in equity, his rights were as valid as those of Keiser were at law. While Keiser’s deed may have imported absolute dominion, it was modified by the interest and rights of Davies, which by the terms of the contract was a condition of the purchase. The contract fixes the status of the parties; Keiser thereunder became a trustee and Davies a
 
 cestui que trust.
 
 The rights of the latter constitute a charge upon the property which equity will enforce in a proceeding as at bar. All the essentials necessary to the creation of an express trust'are present (26 R. C. L. sec. 17, p. 1179, and cases; Seymour v. Freer, 8 Wall. 202; Thomson v. Thomson, 211 S. W. (Mo.) l. c. 56), and the relation arising out of the transaction may properly be thus designated.
 

 III. The conduct of Davies throughout this transaction will determine whether he has been guilty of such a delay in asserting his rights as to preclude his recovery. In cases involving the question of laches, each must of necessity be determined by its own facts. [Shelton v. Horrell, 232 Mo. l. c. 373; Rutter v. Carothers, 223 Mo. l. c. 640; Hudson v. Wright, 204 Mo. 428; Stevenson v. Smith, 189 Mo. 447.] What would constitute such inertia on the part of one as to bar an action might reasonably be held ineffectual for that pur
 
 *15
 
 pose in another. This is the basis for the holding that mere lapse of time alone will not constitute laches. A discussion of the modifications of the rule under varying circumstances would be purely academic in the presence of the fact that the question may be definitely determined by the conduct of Davies alone. During the years that intervened between the completion of the buildings and the bringing of this suit, he did not abandon his claim or conduct himself in such a manner as to lend Keiser to so conclude. In 1911 or 1912, Davies asked Keiser for an accounting. The latter did not deny his'right to the same, but evaded a compliance with the demand by saying that “the property don’t pay, there is nothing coming. ’ ’ Davies was authorized to rely upon the truth of Keiser’s statement; but in December, 1912, to render permanent his assertion of his claim, he placed the contract upon record. Thereafter, he made several demands upon Keiser for an accounting and as evidence at all times of Keiser’s knowledge of the live nature of Davies’s claim, the former at one time said he was going to make the latter a present of five hundred dollars and at another time sought to procure a quitclaim deed from Davies to the property. While it is true that during these times Keiser was paying the interest on the notes secured by deeds of trust on the property, the taxes and the insurance, he-was also receiving all of the rents and was thereby benefited rather than injured by Davies’s inaction. One of the essentials to an authorized interposition of the doctrine of laches to defeat an action is that it be shown to have caused some prejudice to the adverse party. No such condition exists here. Another fact not urged but nevertheless worthy of consideration was that during the greater portion of the time covered by Davies’s delay, the property was encumbered by a deed of trust which was being paid off from the rents. The discharge of this lien was of first necessity before either party could, without loss, demand a settlement. However, this argument, except as a salient circumstance to account for Davies’s delay, is not necessary, as the facts
 
 *16
 
 are ample to show that he did not sleep on his rights. [Summers v. Abernathy, 234 Mo. l. c. 167; Cantwell v. Crawley, 188 Mo. l. c. 57; Conn. Mut. Life Ins. Co. v. Carson, 172 S. W. (Mo. App.) l. c. 73; Hayes v. Wyatt, 202 S. W. (Mo.) l. c. 586.] As a crowning conclusion deduced from numerous rulings, it is stated, in effect, in 6 Cyc. 301, that “laches is not mere delay, but a delay that worts disadvantage to another. So long as the parties are in the same condition, it matters little whether one presses a right promptly or slowly within limits allowed by law.” We therefore conclude that there is no merit in this plea of laches.
 

 IY. Kindred to the foregoing contention is the plea of the Statute of Limitations. It was not pleaded by the defendant. [Stevenson v. Smith, 189 Mo. l. c. 466; Pattison, Code Pl., sec. 704, p. 368.] Furthermore, the statute does not begin to run against an express trust until it is openly disavowed. There was no disavowal by Keiser until he filed his answer. [State v. Ricords, 52 Mo. 581.] Although the facts concerning the existence of the trust were known to Davies, he could not, for the reason we have stated concerning the incumbrance on the lots, have more promptly instituted this action. Especially is this true where, as here, there was no denial by the trustee of the existence of the trust relation. [Priest v. Capitain, 197 S. W. (Mo.) 83; Moulden v. Train, 199 Mo. App. 509; Newton v. Rebenack, 90 Mo. App. 650; Bender v. Zimmerman, 80 Mo. App. 138.] Aside from our rule as announced in Stevenson v. Smith, supra, that the Statute of Limitations must be pleaded except in actions of ejectment, there is the additional one especially applicable to cases as at bar that the statute does not run because the possession of the trustee is also that of the beneficiary and there is no adverse holding. [28 Am. & Eng. Ency.- p. 1133 and notes.]
 

 
 *17
 
 
 *16
 
 Y. We are unable to determine from the language employed what is meant by Davies’s failure to do equity
 
 *17
 
 as a condition precedent to the right of his assignee to recover. The arguments urged in support of this contention are not borne out by the facts. They deny an equality of burdens, and assume that all of these, have and are being borne by Keiser. This is specious, and finds sup-' port only in fancy. It is true that Keiser advanced -the money ($1500) to buy the lots. It is not true that “he advanced every dollar to pay the purchase price of the buildings.” This was obtained by securing a loan in the amount of their cost, attested by notes made by the straw man, Cooch, and pledging the lots — the property of Keiser and Davies — to secure their payment. To balance or equalize Keiser’s burden in buying the lots, Davies drew the plans for the flats, had the lots surveyed, took bids for the buildings, let the contracts for same, paid off the employees and superintended the work. To the unbiased mind, equipped with at least the average knowledge of the ordinary man as to the character of the services rendered by Davies and the time necessarily employed in their performance, it is evident, without specific proof, that their value is reasonably equal to Kaiser’s payment for the lots. That'Keiser has long since repaid himself this purchase price of the lots out of the rents is not an unreasonable conclusion. Whether he has paid the notes in full and discharged the liens on the lots can be determined in ascertaining his liability to the plaintiff -in this transaction. That Davies has done equity, if by this defendant refers to an equalizing of burdens, with Keiser, we are, from all of the facts, well satisfied.
 

 VI. It is urged that the trial court erred in ordering a partition of the property. We hold that the finding of the chancellor was sustained by the facts in that Davies or his assignee is seized and entitled to a one-half undivided interest in said property. This finding was properly preliminary to the order of partition as conforming to our rulings that the title
 
 *18
 
 and right of possession must he first settled before a decree in partition can be had between joint tenants, tenants in common and coparceners. [Chamberlain v. Waples, 193 Mo. l. c. 111.] This ruling is as applicable to a case in equity as at law. In Martin v. Martin, 250 Mo. l. c. 545, we said:- “That equitable interests in land may be partitioned in an appropriate proceeding for that purpose has been long settled in this State. While such a proceeding is called an equitable one in distinction from the action at law prescribed by the statute in such cases, it is also settled that the practice will be regulated by the statutory provisions so far as applicable.” [Citing cases.]
 

 The right to a partition, the decree being interlocutory, having been ascertained (Marsala v. Marsala, 288 Mo. 501, 232 S. W. 1048; Remmers v. Remmers, 239 S. W. (Mo.) 514), the court may in the exercise of complete equitable jurisdiction order same although the legal title to the premises is in a trustee who is a defendant and the equitable title of the plaintiff is the one in issue. [Holloway v. Holloway, 97 Mo. 628.]
 

 “When the plaintiff asks for partition, and the defendant is in the adverse possession of the property, the courts refuse to partition the land between them, until plaintiff establishes his title, and a suit in ejectment is the proper proceeding for that purpose; but where, as here, the plaintiff has an equitable title, and asks the aid of the court of equity to establish it, if the court ascertain that' he has an interest, and what that interest is, the doctrine that partition cannot be had when the defendant is in the adverse possession of the premises, does not apply. The decree establishes plaintiff’s title, and under it the court may put him in possession, and a suit in ejectment becomes necessary. The court, having acquired jurisdiction of the cause, may proceed to determine the whole controversy by decreeing a partition. of the premises.” [Rozier v. Griffith, 31 Mo. 171; Dameron v. Jameson, 71 Mo. 97, l. c. 100.]
 

 
 *19
 
 VII. In consideration of all of the foregoing, the finding of the chancellor that each of the- parties hereto is seized and entitled to an undivided one-half interest in said premises is affirmed, and this case is remanded with directions to the trial court to order an accounting based upon the interests of the parties as shown by the evidence; that said Keiser be required to account for all money expended on said property, whether from his own funds or from rentals, and for all money received as rents therefrom; that the trial court appoint a referee, first affording the parties the right to agree upon one, to take testimony and make and state a mutual account for all of the rents and profits and dealings and transactions pertaining to the income and expenditures upon said premises from March 1, 1907 — the date of the completion of the buildings on said lots — to the present time. In taking said accounting the referee is to make a just and fair allowance to the parties as shown by the facts and report in detail his findings within such time as the court may direct. If it be found after the filing of said report and the adjustment of the accounts, that a partition in kind of the premises can be made, the court will so order; if it be found that a partition in land cannot be made without great prejudice to the owners, a special commissioner may be appointed to make a public sale of the property and report the same to the court, which shall order a partition of the proceeds between the parties hereto according to their respective interests and in conformity with the final decree to be entered herein. If a commissioner be appointed, he shall, before entering upon the discharge of his duties, file with the clerk of the trial court his bond, payable to the State of Missouri, with such sureties as may be required by the court, in such sum as the court may deem proper, that he shall faithfully discharge his duties as special commissioner, and account for and pay over, according to the final order of the court, to the parties entitled thereto, all such sums of money as may come into his possession as such special commissioner.
 

 
 *20
 
 The costs of the said partition shall be paid out of the proceeds of the sale of the property. All other costs to be borne by defendant. It is so ordered. Affirmed and remanded.
 

 All concur..